IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KRISTOPHER MICHAEL MORGAN                                    PLAINTIFF

v.                                    Civil No. 5:21-cv-05114

THERESA ROTHE, KCH; JON BECKHAM, KCH;
SERGEANT SARAH SEARS; JOLANA WILSON, KCH;
SYDNEY SIMMONS, KCH; CORPORAL TOM MULVANEY;
RACHEL YOUNG, KCH; NURSE KELLEY HINELY;
JANET HANEY, Employed by Summit;
CORPORAL RAINES; and CORPORAL EMMUS               DEFENDANTS


KRISTOPHER MICHAEL MORGAN                                    PLAINTIFF

v.                                    Civil No. 5:21-cv-05124

KELLEY HINELY, KCH; SYDNEY SIMMONS, KCH;
THERESA ROTHE, KCH; JANET HANEY,
Employed by Summit; CORPORAL RAINES;
CORPORAL EMMUS; and SERGEANT SEARS               DEFENDANTS


KRISTOPHER MICHAEL MORGAN                                    PLAINTIFF

v.                                    Civil No. 5:21-cv-05153

THERESA ROTHE, KCH; NURSE JON BECKHAM, KHC;
NURSE JOLANA WILSON, KCH; SYDNEY SIMMONS, KCH;
and RACHEL YOUNG, KCH                              DEFENDANTS


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

These are consolidated civil rights actions filed pursuant to 42 U.S.C. § 1983 by Plaintiff,

Kristopher M. Morgan ("Morgan").   Morgan proceeds *pro se* and *in forma pauperis.*   At the time

he initiated these actions, Morgan was incarcerated in the Washington County Detention Center

1

("WCDC"). Morgan contends he was provided an inadequate diet, denied adequate dental, mental health, and medical care, and for some period was denied access to a newspaper. Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

The case is before the Court on the Motion for Summary Judgment filed by Separate Defendant Janet Haney (ECF No. 65) and the Motion for Summary Judgment filed by the remaining Defendants (ECF No. 79). Morgan has responded (ECF No. 89) to the Motions.[1]

## I.      BACKGROUND

Morgan was booked into the WCDC on January 12, 2021, on a pending criminal charge. (ECF No. 81-2). He had prior injuries to his knee and shoulders and a pinched sciatic nerve from a motorcycle accident in 2002. (ECF No. 81-17 at 4-5, 9).[2] He also had been treated at a mental health facility for a period of approximately six months in late 2018 and early 2019 due to panic attacks, night terrors, cold sweats, and nervousness around large groups of people. *Id.* at 4. Morgan remained incarcerated at the WCDC until November 19, 2021, when he was transferred to the Arkansas Division of Correction ("ADC"). (ECF No. 81-17 at 23).

Summit Food Services, LLC ("Summit") is the food service provider for the WCDC. (ECF No. 67 at 21). Defendant Janet Haney is the food service director, and she oversees all food production and menus at the WCDC. *Id.*

---

1 The summary judgment motions, briefs, exhibits, and Plaintiff's response exceed 1,000 pages.
   [2] All citations to Morgan's deposition are to the CM/ECF document number and page rather than to the deposition page numbers.

Karas Correctional Health ("KCH") is the medical care provider for the WCDC.   (ECF No. 81-1 at 4).   Dr. Robert Karas is the supervising physician.   (ECF No. 81-18 at 1).   Defendant Kelley Hinely is a nurse practitioner ("NP") employed by KCH.   *Id.*   She is a medical care provider at the WCDC.   *Id.*

## II.      APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Com. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat. Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not

3

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.    DISCUSSION

42 U.S.C. § 1983 imposes civil liability upon one:

> who under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.

### A.    Summary Judgment Motion filed by Defendant Janet Haney

Defendant Janet Haney has moved for summary judgment on the following grounds: (1) she is not a medical care provider and was not involved in making health care decisions; (2) Morgan was provided adequate nutrition in the form of a diet approved by a dietician; (3) she responded promptly to all food related requests submitted by Morgan; (4) alternatively, she is entitled to qualified immunity on each of these claims; and (5), there is no basis for an official capacity claim.

### 1.    Health Care Decisions

It is clear Defendant Haney is not a medical care provider.   (ECF No. 67 at 21).   Morgan's testimony indicates he only believed Defendant Haney was a nurse because he was told the medical department was responsible for dietary decisions.   (ECF No. 81-17 at 20).   Defendant Haney cannot be held liable for medical decisions for which she had no personal involvement or responsibility. *Turner v. Mull*, 784 F.3d 485, 493 (8th Cir. 2015) (Liability under § 1983 requires a "causal link to, and direct responsibility for, the deprivation of rights").   She is entitled to summary judgment on this claim.

4

## 2.   Adequacy of Meals

### a.   Summary of the Facts

Morgan testified the food was not "up to par."   (ECF No. 81-17 at 16).   He believed there should be a dietician or a nutritionist on the staff.   *Id.*   He felt the portions were way too small and some of the meals had no protein.   *Id.*   Morgan did not believe that all inmates needed the same nutrition.   *Id.*   He pointed out that he was 6'2" and weighed 250 pounds, and he felt he needed more nutrition than an inmate who was 5'1" and weighed 100 pounds.   *Id.*   He believed he required over 3,000 calories a day.   *Id.*   While he was told the meals at the WCDC contained over 3,000 calories a day, Morgan felt he received under 2,000 calories per day.   *Id.*   Morgan was on a vegetarian diet for a few months, and during this time, Morgan testified they took the protein away and did not replace it.   *Id.* at 17.   Morgan believed the protein should have been replaced with eggs or chicken.   *Id.*   He indicated he was served few fruits and vegetables.   (ECF No. 81-3 at 3).

During his incarceration at the WCDC, Morgan testified he lost over 60 pounds.   (ECF No. 81-17 at 17).   Morgan weighed 310 when he was booked in and weighed 240 when he was transferred to the ADC.   *Id.*   Even after the protein was returned to his tray, Morgan testified he continued to lose weight.   *Id.*   Because he was indigent, Morgan seldom had money to purchase commissary to supplement his meals.   *Id.*

WCDC records indicate that on February 13, 2021, Morgan asked to be switched to a vegetarian diet.   (ECF No. 81-5 at 18).   On February 25th, Morgan complained he had gotten no

5

fruit, very few vegetables, and no soy or gluten substitutes.   (ECF No. 81-3 at 3).   Haney responded that the food he was receiving met the requirements for the diet he was on.   *Id.*   When Morgan protested again that the food he received did not meet his dietary and nutritional needs, *Id.* at 4, Haney responded that he was receiving what the vegetarian diet called for.   *Id.*   Morgan requested a copy of the nutritional and dietary guidelines.   *Id.* at 5.   Initially, he was told he had received a copy of the nutritional and dietary guidelines for vegetarian trays when he signed up for the special diet.   (ECF No. 81-6 at 24).   When he said he had not received any papers, he was told by Corporal Mulvaney that he was not entitled to copies of any paperwork other than his commitment orders unless they were served with a court order.   *Id.* at 27.

Morgan asked that they look into whether the diet was "up to standards from a [dietician] or nutrition[]ist."   (ECF No. 81-3 at 3).   On February 26, 2021, Morgan complained his tray contained little to no protein or vegetables.   *Id.* at 4.   On March 6th, Morgan requested that blood work and a full physical be done because he believed the diet was nutritionally deficient.   (ECF No. 81-6 at 32).   In response, he was told he was receiving adequate calories and that his body mass index ("BMI") was well over 18 which is what was required for double portions.   *Id.* Morgan continued to complain about the vegetarian tray until he asked to be switched back to a normal tray on March 16, 2021.   *Id.* at 15.   He was removed from the vegetarian diet effective March 17, 2021.   (ECF No. 81-3 at 15).

After Morgan started receiving normal trays, he continued complaining about his diet. Morgan submitted requests and or grievances regarding his diet, including wanting more protein, double trays, milk, and ensure.   (ECF No. 81-3 at 16-63; ECF No. 81-5 at 19-21).   According to

Morgan's own count, he submitted 35 requests for milk.   (ECF No. 89 at 6).   On July 12, 2021, Morgan asked to be placed on ensure as he did not feel he was getting the proper nutrition.   (ECF No. 81-9 at 17).   Beginning on September 2, 2021, Morgan began asking for second trays because the diet was not up to nutritional standards.   (ECF No. 81-3 at 22; ECF No. 81-5 at 36).   He was advised he was receiving 3,000 calories each day and if he wanted a double portion he would have to go through the medical department.   (ECF No. 81-3 at 23, 53).   Nurse Wilson responded that there was no medical need for Morgan to have a second tray.   (ECF No. 81-5 at 37).

As previously noted, Janet Haney is employed by Summit to oversee all food production and menus at the WCDC.   (ECF No. 67 at 21).   By affidavit, Haney indicates she did not receive any documentation from medical staff regarding "a medically necessary diet" for Morgan.   *Id.* She responded to Morgan's complaints about the diet he was receiving.   (ECF No. 81-3 at 1-63).

Summit's contract requires the provision of three hot meals a day—breakfast, lunch, and dinner.   (ECF No. 67 at 26).   The meals are required to be in accordance with the "National Academy of Sciences to meet the nutritional needs of the inmates."   Additionally, a variety of foods are to be provided "in adequate amounts to meet the Recommended Daily Allowances (RDAs), and American Correctional Association (ACA) standards.   These shall be adjusted for age, gender, therapeutic modifications if needed, and activity level of inmates."   *Id.* at 27.   Each "4-week menu cycle shall provide a weekly average of 3,000 calories daily for adult meals."   *Id.* The menus are prepared by Summit and "reviewed and approved by a Registered Dietician" and approved by the "Sheriff or his/her designee."   *Id.*   Summit agreed to make modifications in the menu, approved by the registered dietician, to "accommodate medically restricted, religious,

7

religious non-pork, vegetarian, and vegan diets at no additional charge." *Id.* Summit agreed to supervise all meal preparation and service to ensure quality, sanitation, texture, consistency, appearance, therapeutic modifications, and temperature." *Id.*

**b.    Legal Analysis**

The treatment a prisoner receives in prison and the conditions of his confinement are subject to scrutiny under the Eighth Amendment.[3] *Farmer v. Brennan*, 511 U.S. 825, 832 (1970). Prisoners are entitled to humane conditions of confinement. *Id.* To prevail on a conditions of confinement claim, the prisoner must show: (1) the condition was serious enough to deprive him of the minimal measure of life's necessities, or to constitute a substantial risk of serious harm; and (2) the officials were deliberately indifferent to the prisoner's health or safety. *Id.*

Prisoners have a right to adequate nutrition. *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980). Failure to provide adequate nutrition may constitute deliberate indifference in violation of the Eighth Amendment. *Wishon v. Gammon*, 978 F.3d 446, 449 (8th Cir. 1992). A prisoner must show "the food he was served was nutritionally inadequate or prepared in a manner presenting an immediate danger to his health, or that his health suffered as a result of the food." *Id.*

Defendant Haney maintains that she did not develop the menus nor is she permitted to vary from the menus. She asserts that she never received any information from medical services that

---

[3] The Eighth Circuit applies the Eighth Amendment's deliberate indifference standard to claims of both pretrial detainees and convicted inmates. *See e.g., Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006) (deliberate indifference standards applies to claims of inadequate conditions of confinement whether prisoner is a pretrial detainee or convicted prisoner).

Morgan should be given a certain medically necessary diet.   Further, she maintains the mere fact that Morgan lost weight does not equate with the meals being inadequate.

As Defendant Haney correctly points out, this Court has found on several occasions that the mere loss of weight by an obese prisoner does not necessarily correlate to there being a question of fact as to whether the meals provided were nutritionally or calorically deficient.   Defendant Haney relies specifically on the decisions in *Giddings v. Cradduck et al.*, Civil No. 5:16-cv-05035, 2017 WL 2791345 (W.D. Ark. June 6, 2017), *report and recommendation adopted*, 2017 WL 2799297 (W.D. Ark. June 27, 2017) and *Emery v. Helder, et al.*, Civil No. 5:16-cv-05193, 2018 WL 715463 (W.D. Ark. Feb. 5, 2018).   In *Giddings*, Joseph Giddings ("Giddings") maintained he weighed 274 when booked in on February 25, 2015.   The detention center records contained three different weights varying by as much as 40 pounds on that date—270, 254, 230.   When Giddings was transferred to the ADC on February 8, 2016, his weight was recorded as 200 pounds. Giddings testified he felt weak and lethargic because of the weight loss.   Giddings submitted no requests for medical treatment due to his weight loss, weakness, or fatigue.   Giddings sued only detention center staff and not the food service contractor.   The defendants submitted copies of menus containing serving sizes beside each food item; the contract with the food service provider; and policies dealing with food service, portion control, and maintaining necessary nutritional and caloric values.   The Court agreed with defendants that Giddings was obese when he entered the detention center and obese when he left it.   The Court held that the mere loss of weight, without some evidence Giddings became ill or suffered physical effects or was denied a nutritionally and calorically adequate diet, was insufficient to create a genuine issue of material fact.

9

In *Emery*, Jason Emery ("Emery") lost a total of approximately 36 pounds over six months. The food service provider, Aramark, submitted the affidavit of the dietician who approved and reviewed the detention center menus. The dietician affirmed that the meals provided met the guidelines of the American Correctional Association, the Food and Nutrition Board of the Institute of Medicine, and the National Academy of Sciences, dietary guidelines for adults aged 19 to 50. Information was also submitted about the preparation and oversight of the meals including the use of specific utensils to ensure that each food item was easily and precisely measured. The affidavit of the food service director was also provided. The Aramark defendants pointed out that by referencing the BMI that Emery was obese when he entered the detention center and still overweight when he was released to the ADC. The Court concluded that Emery did not meet the objective component of the deliberate indifference standard. The Court also concluded there was no genuine issue of material fact as to the subjective component of the deliberate indifference standard.

The fact that Morgan's BMI was measured by medical staff and determined to be above the threshold of requiring additional food, "does not *as a matter of law* foreclose an inadequate-nutrition claim." *Ingrassia v. Schafter*, 825 F.3d 891, 898 (8th Cir. 2016) (emphasis in original). Likewise, a normal BMI and lab results do not foreclose a claim for inadequate nutrition. *Id.* Other than Defendant Haney's assertions that the menus were approved by a dietician, and she was not permitted to vary from them, the Court has not been provided with any information on the meals served to the inmates at the WCDC. Defendant Haney has failed to provide any information about the menus used, portion control methods, or even whether inmates are in fact

10

served fruits and vegetables.  Morgan spent ten months and eight days in the WCDC, during which time he lost 60 pounds.  The Eighth Circuit has held that a far less precipitous weight loss stated a claim for inadequate nutrition.  *See Davis v. Missouri*, 389 F. App'x 579 (8th Cir. 2010) (finding allegation of 19-pound weight loss in eight months sufficient to state a constitutional claim).  Morgan submitted numerous grievances/requests regarding the inadequacy of the diet he was receiving, including not receiving protein, fruits and vegetables, portion sizes varying, and the meals being deficient in vitamins and nutritional and caloric content.  Having moved for summary judgment, Defendant Haney has the burden of proof.  Viewing the evidence in the light most favorable to Morgan, as we must, the Court concludes there is a genuine issue of material fact as to the objective component of the deliberate indifference standard; that is, whether Morgan was provided with a nutritionally and calorically deficient diet which constituted a danger to his health. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Next, Defendant Haney contends Morgan has failed to show that she would have known she was violating his constitutional rights.  The Court agrees there are no genuine issues of material fact as to whether Defendant Haney acted with the required mental state, which is described as being akin to criminal recklessness.  *Roberts v. Kopel*, 917 F.3d 1039, 1042 (8th Cir. 2019).  Review of the food service requests indicate Morgan did not advise Defendant Haney of his significant weight loss; Morgan did not maintain he was being provided less food than other inmates or the food was being prepared in such a way to constitute a danger to his health; Morgan did not indicate that he was suffering from any other adverse physical effects because of the diet

he was being served.   (ECF No. 81-3 at 1-25).[4]   Absent at least some knowledge of Morgan's

significant weight loss, the Court does not believe there is a genuine issue of material fact as to the

subjective component of the deliberate indifference standard; that is, whether Defendant Haney

knew of but deliberately disregarded deficiencies in Morgan's diet.   *See e.g., Ingrassia*, 825 F.3d

at 898-99.   Therefore, Defendant Haney is entitled to summary judgment on this claim.

### 3.      Responses to Grievances

Morgan asserts that Defendant Haney failed to timely respond to his grievances or requests

submitted on the kiosk.   (ECF No. 81-17 at 21).   He felt that a response was timely if made within

a maximum two weeks, and he testified that the usual response time was seven days.   *Id.*   In each

of the requests reviewed during the deposition, Defendant Haney had responded within seven days.

*Id.* at 21-22.

Inmates do not have a constitutionally protected right to a grievance procedure.   *Lombolt*

*v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002); *Teas v. Ferguson*, 608 F. Supp. 2d 1070, 1085 (W.D.

Ark. 2009).   The underlying right protected is the right of access to the courts.   Access to the

courts is "not compromised by a prison's refusal to entertain [a prisoner's] grievance."   *Flick v.*

*Alba*, 932 F.2d 728, 728 (8th Cir. 1991) (per curiam); *see also Buckley v. Barlow*, 997 F.2d 494,

495 (8th Cir. 1993) ("no constitutional right was violated by defendants' failure, if any, to process

all of the grievances [Plaintiff] submitted for consideration").   It therefore follows that failure by

---

[4] The Court notes Defendant Haney did not submit Morgan's food service requests and her responses as part of her summary judgment motion.   These records were, however, included by the County Defendants in their summary judgment motion.

Defendant Haney to respond within the seven-day period thought by Morgan to be acceptable does not violate the constitution.   Defendant Haney is entitled to summary judgment on this claim.

### 4.       Qualified Immunity

The Supreme Court in *Richardson v. McKnight*, 521 U.S. 399 (1997) and *Filarksy v. Delia*, 566 U.S. 377 (2012) outlined two factors to be used in determining whether a state actor was entitled to qualified immunity: the "general principles of tort immunities and defenses applicable at common law, and the reasons we have afforded protection from suit under § 1983."   *Filarksy*, 566 U.S. at 384.   In *Davis v. Buchanan Cnty., Mo.*, 11 F.4th 604, 617 (8th Cir. 2021), the Eighth Circuit in answering these two questions found that medical services contractors are not entitled to assert the defense of qualified immunity.   *Davis*, 11 F.4th at 617.   This case is instructive. The Court finds that a food service contractor is likewise not entitled to assert the defense of qualified immunity.   *See e.g., Dale v. CBM Corr. Food Servs.*, Civil No. 4:14-cv-4003, 2018 WL 3320842 (D.S.D. July 5, 2018) (prison food service providers employed by private corporation not entitled to claim qualified immunity).

### 5.       Official Capacity Claims

A suit against an employee in his or her official capacity is tantamount to an action directly against the employing governmental entity.   *Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 71 (1989).   In this case, the employer is the contract food provider Summit.   Summit can only be held liable if its customs or policies caused the constitutional violations.   Where, as here, there is no proof that one or more of Summit's employees violated Morgan's constitutional rights, Summit may not be held liable.   *See e.g., Ivey v. Audrain Cnty., Mo.*, 968 F.3d 845, 851 (8th Cir. 2020) (if

13

the individual officers are entitled to qualified immunity under the first prong of the analysis, i.e., there is no evidence of a constitutional violation, then the county cannot be held liable); *Schoelch v. Mitchell*, 625 F.3d 1041, 1048 (8th Cir. 2010) (holding that there was no need to consider a pretrial detainee's failure to protect claim against the city when there was no evidence that any of the individual officers committed a constitutional violation).

**B.     Motion for Summary Judgment filed by the Medical and County Defendants**

The Medical and County Defendants argue they are entitled to summary judgment on the following grounds: (1) they were not deliberately indifferent to Morgan's serious medical needs; (2) Morgan's First Amendment rights were not violated; (3) they are entitled to qualified immunity; and (4), there is no basis for official capacity liability.

**1.     Legal Standard for Denial of Adequate Medical Care Claims**

The Eighth Amendment deliberate indifference standard applies to all denial of medical care claims, including those by pretrial detainees and convicted inmates.   *Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (analysis under the Due Process Clause of the Fourteenth Amendment parallels the analysis under the Eighth Amendment).[5]   To succeed on this type of claim, a plaintiff must demonstrate that he had an objectively serious medical need, and that the defendant knew of but deliberately disregarded that need.   *Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020).

To show that he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious

---

[5] At some unknown date, Morgan became a convicted inmate.

14

that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (cleaned up).   For the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (cleaned up).   "Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Id*.   "The plaintiff-inmate must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Meuir v. Green Cnty. Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007).

## 2.      Dental Care

### a.      Summary of the Facts

Morgan submitted requests or grievances regarding his need for dental care, including requests to be placed on the dental list, beginning on January 16, 2021.   (ECF No. 81-3 at 26). On January 17th, Morgan complained he was getting migraines due to the pain from his teeth. (ECF No. 81-5 at 55).   Morgan was placed on the dentist list.   *Id*.   Morgan continued to complain of a toothache and getting migraines due to the pain.   *Id.* at 58, 59.   On January 25th, Morgan was advised that the dentist only extracted teeth and asked whether he was "looking for an extraction or do you want to be seen at sick call."   *Id.* at 62.   Morgan responded he wanted them all extracted.   *Id.*   On January 29th, Morgan again requested to see the dentist.   (ECF No. 81-5 at 68).   He indicated he was starting to get an abscessed tooth.   *Id.*   He was told he would

be placed on nurse call for medication and an antibiotic until he could be seen by a dentist.   *Id.*
On January 30th, Morgan was seen at med call by Nurse Beckham.   (ECF No. 81-11 at 47).
Nurse Beckham noted multiple missing teeth and severe decay.   *Id.*   He indicated he would
prescribe Keflex per protocol.   *Id.*

On February 4, 2021, Morgan asked when the dentist was going to be there because he still
had an abscessed tooth.   (ECF No. 81-5 at 69).   Morgan was told the dentist had not been there
that month and they did not disclose the date he would be there.   *Id.*   On February 5th, Morgan
asked for the pain medication due to his toothache and associated migraines.   *Id.* at 70.   He was
placed on sick call.   *Id.*   On February 7th, Morgan asked why he had "been removed from pain
medicine and [antibiotics] for [an abscessed] tooth."   (ECF No. 81-5 at 75).   He said he had been
told he would be on them until seen by the dentist.   *Id.*   Morgan was advised that the prescription
had only been for seven days.   *Id.*   If he was still having problems, Morgan was told he may need
to be seen again or have the antibiotics restarted.   *Id.*   Morgan responded that he was in pain
because his tooth was abscessed.   *Id.*   In response, Morgan was told his Tylenol had been
extended.   *Id.*

On February 9, 2021, Morgan stated the toothache was ongoing and asked if there was any
word on the dentist.   (ECF No. 81-5 at 76).   He was again told the dentist came only once a month
and the list was usually long.   *Id.*   He was advised he would be seen in the order he was placed
on the list.   *Id.*   On February 12th, Morgan submitted a request noting he had an abscessed tooth
which resulted in him suffering migraines.   (ECF No. 81-6 at 4).   On February 14th, Morgan was
advised he was "high up on the dentist list so when he comes next, you should be seen."   *Id.* at 6.

16

On February 16th, Morgan was told the medical staff does not have any say in who the dentist picks to treat.  *Id.* at 8.

On February 21, 2021, Morgan complained that while the Tylenol was helping some with the abscessed tooth, it was not strong enough to alleviate the pain from the bad migraines.  (ECF No. 81-6 at 14).  In response, Morgan was advised that he was on two medications for pain— Tylenol and meloxicam.  *Id.*  He was told that narcotic pain medication was not prescribed at the facility.  *Id.*  On February 22nd, in response to a request by Morgan, he was told that his Tylenol and meloxicam prescriptions had been renewed until March 24th.  *Id.* at 17.  On February 24th, Morgan noted he was still waiting to see the dentist and was in constant pain from the abscess and associated migraines.  *Id.*  He was told he was on the list.  *Id.*  On February 25th, Morgan indicated that the Tylenol was "barely touching" the pain from his toothache.  *Id.* at 21.  In response, he was told he was still on medication and on the dentist list.  *Id.*

On March 10, 2021, Morgan complained he had been in the WCDC for almost three months and was dealing with tooth pain and migraines and still had not seen a dentist.  (ECF No. 81-6 at 35).  Morgan was informed he was on pain medication and was still on the dentist list. *Id.*  On March 12th, Morgan stated his tongue and the inside of his mouth was getting cut up from his broken teeth.  *Id.* at 38.  Morgan asserted that he needed to be seen by a dentist.  *Id.*  Morgan was asked if he wanted to be seen at sick call or just added to the dentist list.  *Id.*  He responded that he wanted his teeth pulled and he should have been placed on the dentist list three months ago. *Id.*  Nurse Beckham responded that Morgan would be seen when the dentist came next because

he was high up on the list.   *Id.*   Morgan was seen by NP Hinely on March 16, 2021, and she noted "multiple dental caries with hyperplasia on gums."   (ECF No. 81-11 at 62).

Since his first request in January 2021, Morgan had continually complained about his abscessed tooth and associated migraines.   (ECF Nos. 81-6 at 1-45).   Morgan continued to be told he was on the dentist list.   (See, e.g., ECF No. 81-6 at 8).   Further, he was advised that "no emergency extractions were performed here.   The dentist comes once a month."   *Id.*   According to Morgan, between January 11 and March 19, 2021, he submitted 24 requests for dental work and associated pain management.   (ECF No. 89 at 4).

Finally, on March 19, 2021, Morgan was seen by the dentist.   (ECF No. 81-6 at 45).   Two teeth were extracted.   (ECF No. 81-11 at 5-6).   The dentist noted that teeth across both arches were bad and hurting.   (ECF No. 81-12 at 1).   Later that day, Morgan requested anbisol or Orajel since he had two teeth pulled and was in a lot of pain.   (ECF No. 81-6 at 47).   He was told they did not have either medication.   *Id.*   Morgan immediately asked to be put back on the dental list. *Id.*   On March 20th, Morgan again asked to see the dentist for a toothache.   *Id.* at 49.   He was told he was back on the dental list for April.   *Id.*   Morgan continued to ask to be placed on the dental list on a monthly basis.   (ECF No. 81-7 at 9 (June); ECF No. 81-8 at 18 (July); ECF No. 81-9 at 41 (August); ECF No. 81-9 at 56 (September); ECF No. 81-10 at 32 (October); ECF No. 81-13 at 29 (November); ECF No. 81-13 (December)).

Morgan was next seen by the dentist on April 16, 2021, and two broken teeth were extracted.   (ECF No. 81-11 at 10-11).   On May 13th, Morgan complained that he was continuing to get migraines because of an abscessed tooth.   (ECF No. 81-7 at 2).   On May 21st, Morgan was

18

seen by the dentist and two more broken teeth were extracted.   (ECF No. 81-11 at 13-14).   On June 18th, Morgan was again seen by the dentist and two more broken teeth were extracted.   *Id.* at 20-21.   On July 30th, Morgan was seen by the dentist and two teeth were extracted.   (ECF No. 81-13 at 3).   On August 20th, two more broken teeth were removed.   (ECF No. 81-11 at 25).   On November 12th, two more broken and painful teeth were extracted.   *Id.* at 27-28.

The detainee dental services policy provides that detainees experiencing acute dental problems (*i.e.,* severe pain, infection, bleeding gums, etc.) may receive emergency dental care and "other treatment as deemed necessary by a contract dentist."   (ECF No. 81-16 at 7).   Detainees are seen by the dentist in the order they are placed on the list.   (ECF No. 81-6 at 37).   The dentist comes once a month.   *Id.* at 7.   Extractions are the only option available to detainees.   *Id.* at 15.   No emergency extractions are done.   *Id.* at 7.

**b.    Legal Analysis**

It has been said that "[d]ental care is one of the most important medical needs of inmates." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980)).   The Eighth Circuit has recognized that "[t]oothaches can be excruciatingly painful, and dental care is an important part of proper health care." *Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007).

Morgan clearly had an objectively serious need for dental care.   It was noted he had multiple broken and decayed teeth.   He was treated several times with antibiotics for abscessed teeth.   He was repeatedly given over-the-counter pain relief due to his dental pain.   The objective component of the deliberate indifference standard is met as to all Defendants.

The subjective component of the deliberate indifference standard requires there to be some sufficient mental element attributable to the official in question. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991). A court must look to the knowledge of the defendant and whether he or she acted with deliberate indifference or recklessly ignored an inmate's serious dental needs. *Langdon*, 614 F.3d at 460. A delay in providing dental care can constitute deliberate indifference. *See, e.g., Patterson v. Pearson*, 19 F.3d 439, 440 (8th Cir. 1994) (one-month delay treating infection that required extraction could constitute deliberate indifference); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (three-week delay in sending referral for dental care after observing swollen and infected tooth was unreasonable and raised triable fact questions); *Cf., Johnson v. Leonard*, 929 F.3d 569, 577 (8th Cir. 2019) (Dentist did not ignore complaints of pain or exhibit deliberate indifference when he saw inmate every time he was put on the dental list, treated him 10 times over 17 months, and performed dental exams, cleanings, x-rays, a tooth extraction, temporary fillings, and permanent fillings).

### i.    Defendants Nurse Sydney Simmons, Nurse Teresa Rothe, Nurse Jon Beckham, Nurse Jolana Wilson, and Nurse Rachel Young

It is clear from Morgan's requests for dental care and these Defendants' responses to them, that they did nothing more than follow the practice and procedures of KCH. As nurses, they had no authority to prescribe medication. There is no evidence the nurses could authorize emergency dental treatment or do anything other than place Morgan on the list to be seen by the dentist. The nurses did refer the requests to the provider to obtain medication and treatment for Morgan. There is no genuine issue of fact as to whether these nurses acted with deliberate indifference to, or with

reckless disregard for, Morgan's serious dental needs.   These nurses are entitled to summary judgment on Morgan's dental care claim.

### ii.      Defendant NP Hinely

NP Hinely could prescribe medication and authorize emergency or additional dental treatment.   In NP Hinely's affidavit she sets forth a chronology of the correspondence, assessments, interventions, and treatment given to Morgan for all his medical needs, and she concludes that the evaluation and treatment of his medical, dental, and mental health needs "was both appropriate and thorough."   (ECF No. 81-18 at 8).   The record indicates NP Hinely on one occasion examined Morgan's teeth and gums, and she noted multiple cavities and hyperplasia on the gums.   (ECF No. 81-11 at 62).   NP Hinely had access to, and reviewed, the medical records, including Morgan's multiple complaints of tooth pain, abscess, and associated migraines.   The Court believes a reasonable juror could conclude that NP Hinely's failure to make any type of individualized assessment of Morgan's dental needs constituted intentional or reckless disregard. NP Hinely was actively involved in evaluating and treating Morgan, but she failed completely to determine whether simply being placed on a dental list, to be seen in the order placed on the list, which could be months away, was sufficient given Morgan's objectively serious medical needs. Her conduct could be viewed as sufficient to meet the subjective component of the deliberate indifference standard.   NP Hinely is not entitled to summary judgment on the dental care claim.

### iii.      Defendants Corporal Mulvaney, Corporal Raines, Corporal Emmus, and Sergeant Sears.

"Contracting out prison [dental services] does not relieve the State of its constitutional duty to provide adequate [dental services] to those in its custody, and it does not deprive the State's

prisoners of the means to vindicate their Eighth Amendment rights." *West v. Adkins*, 487 U.S. 42, 56 (1988). In other words, detention center personnel can still be held liable under the Eighth Amendment despite the existence of the contract. However, with respect to each of the named WCDC staff, there must be some evidence from which a reasonable juror could conclude they acted with the necessary mental state to meet the subjective component of the deliberate indifference standard. They must have knowledge the contracted for services were inadequate and proceed with such intentional or reckless disregard from which deliberate indifference can be found to exist. On the record before the Court, no such finding could be made. The County Defendants are entitled to summary judgment on Morgan's dental care claim.

### 3.    Mental Health Care

**a.    Summary of the Facts**

Regarding his claim that he was denied adequate mental health care, Morgan testified there was a single person who provided mental health care at the WCDC. (ECF No. 81-17 at 14). Morgan could not recall her name. *Id.* Records submitted by the Medical Defendants indicate her name is Sheila Bryant, a mental health social worker ("SW Bryant"). (ECF No. 81-12 at 18). She is not a named Defendant. *Id.*

On March 2, 2021, Morgan asked to speak to someone about his insomnia, anxiety, "ptsd, add, adhd, etc." (ECF No. 81-6 at 28). He indicated he was getting angry over "little things" and could not sleep. *Id.* Morgan said he did not want to end up fighting someone because of his mood. *Id.* On March 6th, Morgan again complained that he could not sleep and his anxiety and ptsd was "getting very bad." (ECF No. 81-6 at 33). He was once again told he was placed on

psych call.  *Id.*   On March 12th, Morgan complained the Zyprexa was not working.  (ECF No. 81-6 at 39).   He indicated he still felt the same and could not sleep.  *Id.*   In response, he was told he had just been started on the Zyprexa 5mg on March 8th and the drug needed time to build up in his system for the next few weeks before it could be determined if it was working.  *Id.*

On March 19, 2021, Morgan indicated he was still having anxiety and panic attacks but not to the extent he had been previously.  (ECF No. 81-6 at 49).   He also indicated his insomnia was ongoing.  *Id.*   Morgan was asked if he wanted to be placed on psych call.  *Id.*   He indicated he did.  *Id.*

Morgan testified SW Bryant would talk to him in the hallway.  (ECF No. 81-17 at 14).   She would ask how he was feeling, tell him what medication she could give him, and then walk away.  *Id.*   Morgan did not believe this was a proper evaluation.  *Id.*   Morgan testified he has social anxiety, PTSD, paranoia, insomnia, and depression.  *Id.*

Any requests concerning mental health conditions were referred to SW Bryant, who was employed by KCH.  (ECF No. 81-18 at 3).   SW Bryant referred Morgan's complaints to the medical provider (in this circumstance to NP Hinely) when SW Bryant believed medication was either necessary or an increase in the dosage should be considered.   The record indicates that on March 6, 2021, after having been seen by SW Bryant, Morgan was prescribed Zyprexa (olanzapine), 5 mg, for mood stabilization.  (*Id.* at 3-4; ECF No. 81-11 at 58).   On April 7th, following Morgan's complaints that the Zyprexa was not working, the dosage was increased to 10 mg.  (ECF No. 81-18 at 4; ECF No. 81-12 at 8).   Following a complaint on June 2nd that his anxiety was "way up," his Zyprexa dosage was increased to 15 mg.  (ECF No. 81-18 at 5).   On

23

September 9th, the Zyprexa dosage was increased to 20 mg.   (ECF No. 81-13 at 32).   According to NP Hinely, after Morgan made a September 9th request for a mental health examination via zoom, he was referred to the Ozark Guidance Center for a consult.   (ECF No. 81-18 at 8).

**b.      Legal Analysis**

The Court believes Morgan had serious mental health care needs.   The record is clear that NP Hinely was aware of Morgan's mental health care needs.   NP Hinely was responsive to Morgan's needs and increased his medication from 5 mg to 20 mg over the course of several months to treat his anxiety, mood, insomnia, and other symptoms.   A "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).   Even medical malpractice is not necessarily sufficient to rise to a constitutional violation. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citation omitted).

The Court does not believe there is a genuine issue of material fact as to whether NP Hinely deliberately disregarded Morgan's serious mental health care needs.   Nothing in the record suggests the remaining Defendants were involved in the decisions regarding whether, or what, mental health care treatment was needed.   Defendants are entitled to summary judgment on this claim.

**4.      General Medical Care Needs**

**a.      Summary of the Facts**

Morgan maintains the WCDC should have a chronic pain management protocol.   He asserts that nothing the medical staff did was sufficient to stop his pain and suffering.   He also maintains he was entitled to additional medical testing.   Morgan testified that he felt medical requests were ignored by NP Hinely, Nurse Simmons, Nurse Rothe, Nurse Beckham, Nurse Wilson, and Nurse Young even though they were at work.    (ECF No. 81-17 at 8, 9, 13, 15-16). Morgan stated he just wanted to get some pain relief.   *Id.* at 9.   Morgan testified he no longer had his paperwork and could not recall what Sergeant Sears or Corporal Mulvaney had to do with his medical care.   *Id.* at 14.   Morgan submitted grievances complaining that the medical staff was ignoring his requests on the following dates: 7/25-7/29; 8/2-8/7; 8/10; 10/20; 11/1; 11/11.   (ECF No. 81-4).   While Morgan had pretty regular contact with medical staff, he believes they were ignoring him for extended periods of time.   (ECF No. 81-17 at 6).

During his incarceration in the WCDC, Morgan states he was in "physical pain nonstop" from his prior injuries.   (ECF No. 81-17 at 8, 16).   His leg was "burning and on fire" every day. *Id.* at 8.   Further, having dental pain in addition to the other pain did not help.   *Id.* at 9. Whenever his blood pressure was checked, Morgan stated he was told it was on the high side.   *Id.* at 10.   While a second mattress and second blanket helped with the pain, Morgan testified he was only provided those items for a two-week period in May and then one more time in June or July. *Id.* at 13.   All his other requests were denied.   *Id.*

Morgan submitted numerous requests for chronic pain management arising from his neck, shoulders, leg, knee, wrist, and continuous sharp stabbing lower back and hip pain; his pain medication not working; as well as for a second mattress and/or second blanket.   (ECF No. 81-3;

25

ECF No. 81-4).     On January 12, 2021, when his intake screening was done, Morgan indicated he had "many old injuries" after a motor vehicle accident and had knee surgery four years ago.   (ECF No. 81-11 at 43).   He rated his pain as a 10 out of 10.   *Id.*   He was given a one-time dose of Naproxen 440 mg.   *Id.*

On January 14, 2021, Morgan asked for a knee brace due to an existing injury and Ibuprofen for pain management.   (ECF No. 81-5 at 49).   On January 15th, Morgan complained that he was having a hard time walking without a knee brace.   *Id.* at 51.   Morgan was initially given an ace wrap and then a knee brace about one month later.   (*Id.* at 56; ECF No. 81-11 at 34).

On March 3, 2021, Morgan asked if there was anything that could be done for nerve damage and nerve pain.   (ECF No. 81-6 at 31).   Morgan was asked for more specifics.   *Id.* Morgan replied he had a slipped disc in his neck and sciatic nerve damage with pain from his neck and shoulder all the way down to his fingers on his right hand, with three fingers being numb, and then from his right hip down.   *Id.*   Morgan was added to provider review.   *Id.*

On March 8, 2021, Morgan wrote:

[I'm] requesting a full physical with blood work.   [I'm] concerned for my health and mental well being while in jail.   [I] have not gotten to see a dentist or doctor during my incarceration, almost all of my request[s] are ignored in the form of a run around answer.   [I'm] getting really frustrated with being treated like [I] don[']t know anything and [I'm] just a #.

(ECF No. 81-6 at 34).   Morgan was added to review.   *Id.*

On March 9, 2021, blood was drawn.   (ECF No. 81-11 at 3-4).   Morgan was advised the results were normal.   *Id.* at 60.   On March 12th, Morgan asked if there was anything that could be done about nerve damage.   (ECF No. 81-6 at 40).   He indicated he was in constant pain from

it.  *Id.*  In response, he was told he had been prescribed meloxicam 15 mg for his pain since February 15th.  *Id.*  He was asked if he wanted to be seen at sick call.  *Id.*  Morgan responded he would like to see a doctor.  *Id.*

On March 16, 2021, Morgan asked whether since his medication was being changed, he could be taken off Tylenol and meloxicam and be put on Tylenol 3, his anti-depressant, and other medications.  (ECF No. 81-6 at 44).  He was told his request had been sent to the provider for review.  *Id.*  On March 16th, NP Hinely noted that Morgan demonstrated a full range of motion, an upright gait with a slight limp, and he was able to balance well.  (ECF No. 81-11 at 62).  Nurse Hinely added Duloxetine and baclofen.  *Id.*

On April 26, 2021, after a request by Morgan, he was told his Tylenol prescription expired on May 22nd and that olanzapine and Duloxetine did not expire.  (ECF No. 81-6 at 66).  In response, Morgan asked what was going on with his medication.  *Id.*  He said he had a bad migraine and his arm and hand had been numb and tingly for three days.  *Id.*  He asked for his medications to be "fixed" and to have no expiration date.  *Id.*  The response was that he had been given Tylenol until May 22nd.  *Id.* at 67.  When Morgan continued to complain, he was placed on nurse call.  *Id.* at 69.  On April 30th, he was advised a medication was added that should help. *Id.* at 70.

On May 3, 2021, when Morgan continued to complain of migraines and shoulder pain, he was informed his baclofen was increased.  (ECF No. 81-6 at 73).  Morgan continued to complain and reported the doctor call had done nothing.  *Id.* at 75.  On May 5th, Morgan was seen by Nurse Beckham who noted Morgan was oriented to person, place, time, and event.  (ECF No. 81-12 at

16).   Nurse Beckham made no acute findings and noted Morgan was talking and ambulating without difficulty.   *Id.*   On May 15th, Morgan asked for a pillow or second mattress due to nerve damage and a slipped disc in his neck.   (ECF No. 81-7 at 4).   He said when he laid down his arm and legs go numb.   *Id.*   He indicated this had been getting worse the longer he was in the jail. *Id.*   On May 15th, Morgan was told there were no pillows.   *Id.*   Further, he was informed their second mattress protocol was to only provide them to inmates who had back or hip surgery in the past two weeks.   *Id.*   Morgan continued asking for a second mattress and complaining of pain and numbness in his right shoulder, sharp pain in his left hip, and of his right leg being numb and tingling.   *Id.* at 8.   On May 21st, he was told his Tylenol had been renewed for another 30-days and he was being given the "max dose of Mobic for 2 weeks."   *Id.*   On May 28th, two x-rays of his cervical spine were taken.   (ECF No. 81-11 at 15).   The x-rays showed no acute displaced fracture, but "[d]iffuse degenerative disc disease with disc space narrowing and endplate irregularities and anterior osteophytosis," and straightening of the cervical spine possibly due to muscle spasm was also noted.   *Id.*

Morgan continued to request a second mattress and to report that the pain medication was not working.   (ECF No. 81-7 at 8-16, 18-20, 23-28, 30).   In fact, Morgan indicates he submitted 106 requests for an extra mattress to help with the pain.   (ECF No. 89 at 5).

On June 1, 2021, Morgan was advised that chronic pain was not an "indication for 2nd mat in this facility per protocol."   (ECF No. 87-1 at 30).   Morgan then asked what about the pain and numbness in his legs from a broken tail bone.   *Id.* at 31.   That same day, Morgan was advised that his neck x-ray showed degeneration which could contribute to his pain, arm tingling, and other

28

symptoms.   (ECF No. 87-1 at 31).   It was noted that steroids could help with the pain.   *Id.*   On

June 3rd, Morgan asked for a list of his medications and when they expired.   (ECF No. 81-4 at

41).   He was given the following information:

> Baclofen 10 mg., am and pm (no expiration); muscle relaxer/anti-spasmodic
> Duloxetine 60 mg, every am, (no expiration); anti-depressant used for chronic pain
> Olanzapine 15 mg every pm, (no expiration); anti-psychotic used for depression,
> mood disorders, bipolar, pts[d], schizophrenia, anxiety   Tylenol 1000 mg am and
> pm until 06/22/2021   Prednisone 30 mg am until 06/07/2021; steroid for
> inflammation.

(ECF No. 81-7 at 41).   Morgan responded by asking for his medications to be changed because

he was still in constant pain.   *Id.* at 42.

On June 8, 2021, Morgan was informed that his testing had all been normal and that his x-

rays had been read by a radiologist.   (ECF No. 81-4 at 18).   That same day, Morgan was advised

that he was on the "maximum pain medications we can give at this facility."   *Id.* at 21.   Morgan

was approved for a second mattress on June 9, 2021, and ending on June 23, 2021.   (ECF No. 81-

3 at 33, 36).   He was also given a second blanket for two weeks.   (ECF No. 81-7 at 68).

On June 9, 2021, an electrocardiogram was performed and was normal.   (ECF No. 81-11

at 16).   Blood was also collected.   *Id.* at 17-18.   On June 14th, Morgan was tested for Hepatitis

C and HIV and the results were negative.   *Id.* at 19.   Morgan was seen by Dr. Karas on June 14th.

Dr. Karas noted Morgan's gait was normal, the range of motion with flexion and extension of the

back was normal and he had a bilateral negative straight leg test.   (ECF No. 81-12 at 38).   Dr.

Karas' diagnosis was acute chronic leg pain.   *Id.*   X-rays showed no acute lumbar spine

abnormality.   *Id.*

On June 15, 2021, Morgan complained he "popped" his wrist and had a sharp pain from his hand up half-way to his elbow.   (ECF No. 81-8 at 1).   He asked for a brace.   *Id.*   He was told this complaint would be added to his sick call the following day.   *Id.*   On June 17th, Morgan requested a CT scan of his neck, shoulder, hips, and leg as he continued to be in pain.   *Id.* at 21. On June 19th, he asked for Tylenol and his other medications to be renewed.   *Id.* at 24.   That same day, Morgan asked for vision and hearing tests.   *Id.* at 23.   He was told they did not provide vision or hearing tests.   *Id.* at 25.   When he kept insisting that he was in their care and should be able to have these tests done, he was told he had not suffered any injury to his vision or hearing at the facility.   *Id.* at 26.   It was also noted that he was able to see to type on the kiosk, maneuver around the facility, could hear when med call or chow was called, and was able to hear during examinations.   *Id.* at 26.

At some point Morgan did receive another prescription for a second blanket, because he was told on June 21, 2021, that his second blanket prescription ended on July 4th.   (ECF No. 81-8 at 30).   On June 23rd, Morgan asked to see the doctor about constant shoulder, neck, hip, and leg pain.   *Id.* at 34.   On June 25th, Morgan asked to be screened for cancer due to hip and lower back pain.   *Id.* at 36.   He indicated leukemia, lung, brain, and bone cancer ran in his family.   *Id.* Morgan also continued asking for a second mattress.   *Id.* at 50.   He was told he was on the list to see the doctor.   *Id.* at 51.   On June 29th, x-rays of his lumbar spine were taken and Morgan was advised that the x-ray of his lumbar spine showed no acute abnormality.   (ECF No. 81-8 at 45; ECF No. 81-11 at 22).   Morgan was seen by Dr. Karas again on June 29th for complaints of low back pain with occasional radiation and numbness into the right knee.   *Id.* at 50.   Mild tenderness

in the low back area was noted. *Id.* Morgan had a normal gait, negative bilateral straight leg tests, and normal strength. *Id.* Morgan reported the second mat had helped, but Dr. Karas concluded he did not qualify for a second mat but instead should be given as good a mat as possible. *Id.* Blood tests, an EKG, and a urinalysis were ordered. (ECF No. 81-12 at 34). He was tested for HIV and Hep-C. *Id.* at 37.

On July 1, 2021, Morgan asked to see the doctor regarding neck, shoulder, lower back, and knee pains. (ECF No. 81-8 at 57). He indicated the pain in his lower back was sharp and that he could hardly bend over. *Id.* Morgan continued to ask to see the doctor for sharp stabbing pain in his hip and leg. *Id.* at 62. In response, he was told he had "already been seen for this issue multiple times and it ha[d] been addressed." *Id.* On July 7th, Morgan was advised that protocols had changed and second mattresses and second blankets were only available to pregnant individuals—with zero exceptions. *Id.* at 76.

On July 6, 2021, Morgan was passively observed by NP Hinely to have an upright and steady gait. (ECF No. 81-12 at 56). No acute distress was noted. *Id.* On July 12th, Morgan requested a CT scan of his neck, shoulders, lower back, and hips. *Id.* at 61. He complained of acute increasing stabbing pain. *Id.* Morgan said the medication was not working. *Id.* He was seen the following day by Dr. Karas. *Id.* Morgan requested Xanax, Vicodin, and a second mat. *Id.* Dr. Karas continued Morgan on his current medications Cymbalta, Tylenol, and baclofen. *Id.*

On July 10, 2021, Morgan objected to not being placed on the second blanket and second mattress list. (ECF No. 81-4 at 29). He also noted there were men, who were not pregnant, on

the list.  *Id.*  He was advised that he did not qualify for the second blanket/mattress list.  *Id.*

Morgan asked to be seen by the doctor.  *Id.*  On July 13th, Morgan was advised that "[n]arcotic

pain medications and Benzodiazepines are not prescribed at WCDC."  (ECF No. 81-4 at 31).  On

July 14th, Morgan asked to see the doctor again for pain in his neck, shoulder, and sharp stabbing

pain in his lower back, his, and knee.  (ECF No. 81-9 at 21).  He was told he had just been seen

by the provider yesterday for these issues.  *Id.*  On July 15th, Morgan asked for a physical to be

performed by someone other than Dr. Karas.  (ECF No. 81-4 at 33).  He was advised that Dr.

Karas was the only doctor who would be provided.  *Id.*  Morgan repeatedly asked to be seen by

the doctor.  (ECF No. 81-9 at 25, 27, 30-33).  On July 19th, Morgan complained he had been in

constant pain for almost six months and had made repeated requests to see the doctor and get some

medication to ease his pain.  (ECF No. 81-4 at 35; ECF No. 81-9 at 34).  In response, Morgan

was told he had been seen by the provider multiple times and was currently on provider review.

(ECF No. 81-4 at 35).  Morgan continued to send in daily requests to see the doctor or for help

with his pain.  (ECF No. 81-9 at 36-38, 42, 47-48).

On August 2, 2021, Nurse Rothe indicated that Morgan had "been seen by medical multiple

times for the same questions."  (ECF No. 81-4 at 49).  On August 3rd, Morgan stated he was still

in continuous pain and medical had done nothing to alleviate it.  *Id.* at 51.  Morgan pointed out

he was asking for two things.  *Id.*  Specifically, he was asking to be put on the second

blanket/mattress list and to have medications that actually worked.  *Id.*  He indicated the pain had

started after his arrest.  *Id.*  If nothing was done that week, Morgan indicated that he would file a

§ 1983 case for lack of medical care.  *Id.*  In response, Nurse Rothe told him he had been

evaluated several times, was on pain medication, and that medical no longer prescribed double blankets or mattresses. *Id.* On August 17th, Morgan again asked to be seen for the continuous neck, shoulder, lower back, hip, and leg pain. (ECF No. 81-9 at 49). Morgan stated the issue was not taken care of because he was in continuous pain. *Id.* at 51. He stated he would continue to put in requests until he was not in pain. *Id.* On August 11th, due to Morgan's continued complaints of pain, NP Hinely ordered x-rays of Morgan's c-spine and shoulder. (ECF No. 81-13 at 5). On August 18th, NP Hinely added prednisone for six days for possible nerve inflammation. *Id.* at 6. NP Hinely also ordered that an appointment be scheduled for Morgan for a physical therapy assessment and evaluation. *Id.* On August 21st, Morgan was informed that they were working on setting up an appointment for him to see a physical therapist. *Id.* at 60. Morgan continued to ask for a second mattress and blanket and to see the doctor due to continuous pain. (*Id.* at 63-68; *see also* ECF No. 81-10 at 1, 3-4, 6, 8, 11-12, 15-17).

On September 9, 2021, it was noted that x-rays of Morgan's hip were normal with no evidence of arthritis, fracture, or malalignment. (ECF No. 81-13 at 33). That same day, NP Hinely ordered an increase in Morgan's Duloxetine dosage to help with chronic pain management. *Id.* On September 10th, since his x-rays were normal, Morgan asked what was going to be done about him being in constant pain. (ECF No. 81-6 at 20). He was told it was a process of elimination finding the source of pain. *Id.* He was asked if he was ever told he had a chronic pain syndrome such as fibromyalgia. *Id.* He was told there were no diagnostic tests for this disorder. *Id.* Morgan continued to ask what was going to be done about his constant pain, for medications that worked, and for a second mattress and blanket. *Id.* at 21-22, 24-31, 33-36, 38-

45.   On September 30th, a second physical therapy appointment was to be scheduled for October 4, 2021.   (ECF No. 81-13 at 30).   On November 5th, NP Hinely noted Morgan had been passively observed on numerous occasions to be ambulating without difficulty.   *Id.* at 27.   She also noted there were no reports of his inability to sleep or perform activities of daily living.   *Id.*

Morgan indicates he submitted 98 requests for pain management and all but three of these requests were denied.   (ECF No. 89 at 4).   Morgan asserts he submitted 204 requests for medical attention.   *Id.* at 5.

As previously noted in this summary, Morgan submitted requests asking for a variety of medical tests to be performed.   Additionally, on June 24, 2021, Morgan asked for his calcium and vitamin d levels to be checked.   (ECF No. 81-5 at 34).   On June 11th, Morgan asked to be tested for cancer and sexually transmitted diseases.   (ECF No. 81-7 at 62).   On June 18th, Morgan asked for a bone density scan, calcium check, diabetes check, vitamin level check, cancer screening, and a lung capacity check.   (ECF No. 81-8 at 19).   On June 19th, Morgan asked for a vision and hearing test.   *Id.* at 23.   On June 25th, Morgan asked to be screened for cancer because of hip and lower back pain.   *Id.* at 36.   That same day, Morgan asked for his hormone levels to be checked. *Id.* at 42.   On June 26th, Morgan asked for an x-ray and a CT scan of his lower back, hips, and tail bone be done.   *Id.* at 44.   On June 27th, Morgan asked for his white blood cell count to be checked and for his lung capacity to be checked.   *Id.* at 47, 49.   On July 11th, he asked for a CT scan of his head, neck, shoulders, lower back, and hips, left knee, and a bone density test.   (ECF No. 81-9 at 12-13, 15).   On July 12th, he asked for an x-ray of his knee.   *Id.* at 16.   On July 19th, he asked for a CT scan of his neck, shoulders, lower back, and hips.   (ECF No. 81-4 at 35).   On

July 31st, Morgan asked for a CT scan of his neck, shoulder, lower back, hip, and leg.   (ECF No. 81-9 at 46).   Morgan indicates he submitted a total of 89 requests for medical procedures.

**b.    Legal Analysis**

It is undisputed that Morgan suffers from chronic pain.   It is also undisputed that Defendants recognized the need to treat his chronic pain and prescribed a variety of medications. Additionally, on two separate occasions for a limited two-week period each time, the Defendants provided Morgan with a second mattress and/or second blanket prescription.   Strangely, although Morgan indicated the simple provision of a second mattress eased his pain significantly, Defendants choose to limit its availability as a treatment option and instead to provide a variety of medications designed to ease his pain.   Defendants ordered x-rays, blood tests, and referred Morgan for physical therapy.

The decisions regarding the care and treatment to be provided Morgan were made by NP Hinely and Dr. Karas, who is not a named Defendant.   The Nurse Defendants did take vital signs and on occasion examine Morgan, but they did not make any decisions regarding Morgan's treatment.   Likewise, the summary judgment record contains no evidence that the Detention Center Defendants were personally involved in making any decisions regarding Morgan's medical care and treatment.

Thus, the question is whether NP Hinely acted with deliberate indifference or recklessly ignored Morgan's medical needs.   *Langdon*, 614 F.3d at 460.   Morgan need not demonstrate a total deprivation of care.   "Grossly incompetent or inadequate care can constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment."

35

*Id.* (cleaned up).   The Court, having carefully reviewed the voluminous summary judgment record, comes to the firm conclusion that the record reveals no more than a difference in opinion as to how Morgan's complaints should have been treated.   Insufficient evidence has been presented to support a finding that NP Hinely deliberately disregarded Morgan's need for treatment of chronic pain.   The Medical Defendants are entitled to summary judgment on the denial of general medical care claim.

**c.       Qualified Immunity**

As noted above, the contract medical service providers are not entitled to qualified immunity.   *Davis*, 11 F.4th at 617.   As to the County Defendants, however, and having found that the facts do not make out a constitutional violation, they are entitled to qualified immunity.   *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**d.       Official Capacity Liability**

A suit against an employee in his or her official capacity is tantamount to an action directly against the employing entity.   *Will v. Michigan Dep't. of State Police*, 491 U.S. 58, 71 (1989).   In this case there are two potentially liable employing entities: Washington County and KCH.   With respect to Washington County, as the Court has found no evidence the County Defendants were deliberately indifferent to Morgan's dental, mental, or medical health care needs, there is no basis for Washington County to be held liable.   *See e.g., Ivey*, 968 F.3d at 851; *Schoelch*, 625 F.3d at 1048.

With respect to KCH, a "corporation acting under color of state law will only be held liable under § 1983 for its own unconstitutional policies." *Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 590 (8th Cir. 2004) (cleaned up).    Thus, KCH may only be held liable if "there was a policy, custom, of official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006).    A policy means an "official policy, a deliberate choice of a guiding principle or procedure made by the ... official who has final authority regarding such matters." *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 700 (8th Cir. 2016).    A custom is a "persistent, widespread pattern of unconstitutional conduct of which officials have notice and subsequently react with deliberate indifference or tacit authorization." *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 536 (8th Cir. 1999).    The Court believes there is a genuine issue of material fact on the sole issue of whether KCH's policies and procedures regarding the provision of dental care violate the constitution.

### 5.    Denial of Newspaper

a.    **Summary of the Facts**

According to Corporal Mulvaney, the "kiosk system and the operating software ... was updated in the summer of 2021."   (ECF No. 81-1 at 2).    When the system rebooted, "the digital images of the newspaper were very small and, as a result, difficult to read.    Detainees reported the problem to staff and IT staff and the kiosk management company worked to resolve the problem." *Id.* at 2-3.

Morgan testified he did not have access to the newspaper for a month.    (ECF No. 81-17 at 10).    Normally, Morgan testified he had access to the newspaper via a tablet.    *Id.* at 11.    For a

period of time, the newspaper was not available at all.  *Id.*   The inmates were told it was an IT problem.  *Id.*   After that, when the newspaper became available again, Morgan testified the print was so small it was illegible.  *Id.*   Corporal Raines was part of the chain of command the inmates had to go through.  *Id.*   When they asked for a physical newspaper, Corporal Raines denied the request.  *Id*.  Morgan believes Corporal Raines had the authority to give him a printed newspaper. *Id.*  Morgan named Corporal Emmus as a Defendant because he responded on the kiosk that it was an IT problem.  *Id.*   Sergeant Sears "got in touch with IT and said that the problem would be fixed within the next week or—week to 10 days, and it was."  *Id.*   While it was fixed, the pages were not aligned.  *Id.* at 12.   This resulted in him having to go through 60 pages of newspaper rather than 20.  *Id.*   Morgan believes Sergeant Sears is liable because he did not have access to the newspaper for over a month.  *Id.* at 11-12.

The grievances/requests submitted indicate that on July 2, 2021, Morgan asked for the newspaper to be fixed.  (ECF No. 81-4 at 27).   In response, he was told that there was an issue at the newspaper office on how the newspaper was loaded and their IT department was working to get the issue corrected.  *Id.*   In the meantime, Morgan was told he had access to local and national news via the television in the housing area.  *Id.*

**b.    Legal Analysis**

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," *Shaw v. Murphy*, 532 U.S. 223, 229 (2001), "incarceration does not divest prisoners of all constitutional protections."  *Id.* at 228; *see also Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) ("Prison walls do not form a barrier

separating prison inmates from the protections of the Constitution."). Among other things, the "Constitution protects the rights [of inmates] to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972). Restrictions on access to newspapers have been upheld in only limited circumstances. *See e.g., Beard v. Banks*, 548 U.S. 521 (2006) (upheld prison policy restricting access to newspapers, magazines, and photographs to a small subpopulation of inmates placed in the most restrictive level of prison's long-term segregation unit).

Here, the issue is not whether a ban or restriction on access is reasonably related to legitimate penological purposes. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). Rather, there was merely a short period of time when the newspaper was either not available or the print was so small it was hard to read. Temporary problems with newspaper access caused by a computer software upgrade do not violate the First Amendment. The named County Defendants did not perform the upgrade, were not responsible for fixing the problems caused by the upgrade, and did not intentionally or unjustifiably interfere with Morgan's right of access to the newspaper. At most, Corporal Raines refused to provide Morgan with a printed newspaper. This is insufficient to violate the First Amendment when the newspaper was available electronically, albeit difficult to read, and Morgan had access to the television for local, state, national, and international news. *Cf., Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) (finding in the context of the opening of inmate mail outside their presence that an "isolated incident, without any evidence of improper motive or resulting interference with the inmate's right to counsel or to access to the courts, does not give rise to a constitutional violation"); *Sizemore v. Williford*, 829 F.2d 608, 610-11 (7th Cir. 1987) ("merely alleging an isolated delay or some other relatively short-term, non content-based

disruption in the delivery of inmate reading materials will not support ... a cause of action grounded upon the First Amendment").

c.      **Qualified Immunity**

Having found that the facts do not make out a constitutional violation, the County Defendants are entitled to qualified immunity.   *See, e.g., Krout*, 583 F.3d at 564 (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

d.      **Official Capacity Liability**

Morgan has not alleged that any policy or custom of Washington County caused the temporary interference with his ability to read the newspaper.   There is simply no basis on which to hold Washington County liable.   Further, "[w]ithout a constitutional violation by the individual officers, there can be no ... [County] ... liability."   *Sanders v. City of Minneapolis, Minn.*, 474 F.3d 523, 527 (8th Cir. 2007).

## IV.    CONCLUSION

For these reasons, it is recommended that:

•      The Motion for Summary Judgment (ECF No. 65) filed by Defendant Janet Haney be **GRANTED** and all claims against her be **DISMISSED;**

•      The Motion for Summary Judgment (ECF No. 79) filed by all other Defendants be **GRANTED IN PART and DENIED IN PART as follows:**

a.   the Motion should be **GRANTED** as to all claims asserted against Sergeant Sears, Corporal Mulvaney, Corporal Raines, and Corporal Emmus, and they should be **DISMISSED** as Defendants.

b. the Motion should be **GRANTED** as to all claims asserted against Nurse Rothe, Nurse Beckham, Nurse Wilson, Nurse Simmons, and Nurse Young, and they should be **DISMISSED** as Defendants.

c. The Motion should be **DENIED** as to the individual capacity denial of dental care claims against Nurse Practitioner Hinely and as to the official capacity claim against Karas Correctional Health.

In summary, the individual capacity denial of dental care claim against Nurse Practitioner Kelley Hinely and the official capacity denial of dental care claim against Karas Correctional Health would remain for trial.   All other claims and all other Defendants would be dismissed.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this 21st day of July 2022.

/s/ *Mark E. Ford*
_____
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE